1  Jonathan W. Fountain, Esq.
   Nevada Bar No. 10351
2  Matthew J. Kreutzer, Esq.
   Nevada Bar No. 8834
3  HOWARD & HOWARD ATTORNEYS PLLC
   3800 Howard Hughes Pkwy., Suite 1000
4  Las Vegas, NV 89169
   Tel. (702) 257-1483
5  Email: jwf@h2law.com
   Email: mjk@h2law.com
6
7  *Attorneys for Sit Means Sit Franchising, Inc.*

8  **UNITED STATES DISTRICT COURT**
   **DISTRICT OF NEVADA**

9  SIT MEANS SIT FRANCHISE, INC., a
   Nevada corporation,
10
                    Plaintiff,                     **VERIFIED COMPLAINT**
11                                                 **FOR INJUNCTIVE RELIEF**
    v.                                             **AND DAMAGES**
12
    SMSHTX, LLC, a Texas limited liability
13  company, SMS NC, LLC, a Texas limited
    liability company, HAMID PARVIZIAN, an
14  individual, and JOSEPH ARNETTE, an
    individual,
15
                    Defendants.
16

17        Plaintiff Sit Means Sit Franchise, Inc. ("Plaintiff", "Sit Means Sit", "SMS," or

18  "Franchisor"), states its Verified Complaint for Injunctive Relief and Damages against

19  Defendants SMSHTX, LLC ("SMS Houston"), SMS NC, LLC ("SMS NC"), Hamid Parvizian

20  ("Mr. Parvizian"), and Joseph Arnette ("Mr. Arnette") (together, the "Defendants"), as follows.

21                          <u>**NATURE OF THE CASE**</u>

22        This is a franchisor-franchisee dispute between SMS, the owner and franchisor of the

23  popular Sit Means Sit® brand of dog training businesses, and its recently terminated franchisees

24  who, in violation of the parties' franchise agreement and SMS's trademark rights, have continued

25  to operate their Sit Means Sit® dog training businesses despite the fact that on June 9, 2023, SMS

26  terminated Defendants' franchise rights including, among others, the right to operate Sit Means

27  Sit® brand dog training businesses, the right to use the Sit Means Sit® system for operating dog

28  training businesses, and the right to use SMS's federally registered Sit Means Sit® trademarks in

HOWARD & HOWARD ATTORNEYS PLLC

commerce in connection with dog training businesses.

By and through this action, SMS seeks preliminary and permanent injunctive relief to prevent the Defendants from engaging in any further use of the SMS System and trademarks, as well as damages, attorneys' fees, and costs.

## JURISDICTION AND VENUE

1.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because SMS's causes of action arise under the laws of the United States, specifically, under the Lanham Act, 15 U.S.C. 1051, *et seq*. and under the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836, *et seq*.  This Court has supplemental subject matter jurisdiction over SMS's state law claim for breach of contract, pursuant to 28 U.S.C. § 1367, as SMS's state law breach of contract claim is so related to its federal law claims that they form part of the same case or controversy under Article III of the United States Constitution.

2.     This Court has personal jurisdiction over the Defendants because they have: (a) expressly consented in writing to this Court's personal jurisdiction; (b) operated Sit Means Sit® brand franchises in accordance with the parties' Franchise Agreements and the written forum selection clauses contained therein; (c) ratified the parties' written Franchise Agreements and the written forum selection clauses contained therein; and/or (d) acquiesced in the parties' written Franchise Agreements and the written forum selection clauses contained therein.  This Court also has personal jurisdiction over the Defendants based upon the *Calder* effects test and Defendants' intentional infringement of Plaintiffs' SMS Marks while knowing that SMS is located in Nevada and while knowing that any injury or harm to Plaintiff from Defendants' acts of infringement would be felt by Plaintiff in Nevada.

3.     Venue is proper in the unofficial Southern Division of this Court pursuant to 28 U.S.C. § 1391(b), (c), and/or (d).

## PARTIES

4.     Plaintiff Sit Means Sit Franchise, Inc. (defined above as "SMS") is a Nevada corporation whose principal place of business is located in Las Vegas, Nevada.

5.     Defendant SMSHTX, LLC is a Texas limited liability company whose principal

place of business is located at 4506 Yale Street, Houston, Texas 77018.

6.     Defendant SMS NC, LLC is a Texas limited liability company whose principal place of business is located at 4506 Yale Street, Houston, Texas 77018.

7.     Defendant Hamid Parvizian (defined above as "Mr. Parvizian") is an individual who resides in or around Houston, Texas, and who owns a 100% membership interest in SMSHTX, and who owns a 50% membership interest in SMS NC.

8.     Defendant Joseph Arnette (defined above as "Mr. Arnette") is an individual who resides in or around Winston-Salem, North Carolina, and who owns a 30% membership interest in SMS NC.

## ALLEGATIONS COMMON TO ALL COUNTS

9.     Generally speaking, a franchise (or franchising) is a method of distributing products or services involving a franchisor, who establishes the brand's trademark and a business system, and a franchisee, who pays a royalty and often an initial fee to the franchisor for the right to do business under the franchisor's trademark and system.  Technically, the contract binding the two parties is the "franchise," but that term "franchise" more commonly refers to the actual business that the franchisee operates.  In order to protect the reputation of the franchisor, its name, and the goodwill accumulated in its trademark, franchise agreements typically provide franchisors with a very high degree of control over the specific ways in which franchisees operate their franchised business.  McDonald's, for example, requires that its franchisees adhere to strict quality controls and exacting methods of operation to ensure that the quality of the food items sold, and the service provided, by its franchisees remains consistently high.

10.     In this case, SMS is the owner and franchisor of the Sit Means Sit® brand of nationally franchised dog training businesses.  SMS has been in the business of offering its Sit Means Sit® brand of dog training franchises since February 2009.

11.     SMS developed proprietary methods for performing successful dog training, for performing successful dog behavior modification, and for operating successful dog training businesses known as the "System."  The specific details of the System constitute a trade secret because they derive economic value from not being generally known to the consuming public.

12.    In addition to the System, SMS, through its corporate affiliate, Sit Means Sit, Inc. ("SMSI"), owns the following trademark registrations listed on the Principal Register of the U.S. Patent and Trademark Office:

| MARK | U.S. Reg. No. | Reg. Date | Goods/Services |
|---|---|---|---|
| **SIT MEANS SIT** | 3,076,692 | 4-Apr-06 | **Dog training services, and educational services, namely, conducting seminars in the field of dog training.** |
| **SIT MEANS SIT** | 3,704,665 | 3-Nov-09 | Prerecorded training videos in the field of dog training; dog collar remote control training devices; dog whistles;<br><br>Clothing, namely, golf shirts, t-shirts, hooded sweatshirts, jackets and wind-resistant jackets; and<br><br>Dog toys. |
|  | 3,852,127 | 28-Sep-10 | Prerecorded training videos in the field of dog training; dog collars remote control training devices; dog whistles;<br><br>Clothing, namely, golf shirts, t-shirts, hooded sweatshirts, jackets and wind resistant jackets; and<br><br>**Dog training services and educational services, namely, seminars in the field of dog training.** |
|  | 4,679,326 | 27-Jan-15 | Pre-recorded training videos in the field of dog training; camcorders; dog whistles; smart phone cases; tablet computer cases; mousepad;<br><br>Clothing, namely, t-shirts, sweatshirts, baseball caps, sun visors, bandanas; and<br><br>On-line retail store services featuring pet accessories, pet food, pet training equipment, pre-recorded DVDs and CDs in the field of dog training, tote bags, messenger bags, gym bags and clothing, namely, t-shirts, sweatshirts, baseball caps, sun visors, bandanas. |
|  | 6,124,267 | 11-Aug-20 | **Dog training; conducting seminars in the field of dog training; providing a website featuring information in the field of dog training; and** |

HOWARD & HOWARD ATTORNEYS PLLC

4

| MARK | U.S. Reg. No. | Reg. Date | Goods/Services |
|---|---|---|---|
| | | | Clothing, namely, T-shirts, sweatshirts, baseball caps, sun visors being headwear, bandanas. |

(Collectively, the "SMS Marks"). True and accurate copies of SMS' trademark registrations for the SMS Marks are attached hereto as Exhibit 1.

13.    As a result of its longstanding use of the SMS Marks in commerce, SMS has acquired common law rights in the SMS Marks for use in connection with, among other goods and services, dog training services. Consumers have come to associate the SMS Marks with dog training services provided exclusively by SMS franchisees.

14.    Based on its common law rights and its federal trademark rights, SMS owns the exclusive right to use the SMS Marks in commerce in connection with dog training services and all related goods and services throughout the United States.

15.    Upon entering into a written franchise agreement to operate a Sit Means Sit® dog training franchise, franchisees are provided with, among other things, education, and training in the System, along with a limited license to use the System as well as a limited license to use the SMS Marks to provide dog training and dog behavior modification services. In exchange, among other fees, franchisees are required to pay SMS monthly royalty fees to compensate SMS for the franchisee's use of the System and the SMS Marks as well as any expenditures SMS incurs to promote the Sit Means Sit® brand for all franchisees. Because franchisees only receive limited licenses to use the System and SMS Marks, if a franchise agreement is terminated, for example because a franchisee has failed to pay royalties, upon termination, the franchisee no longer has *any* right whatsoever to use the System or the SMS Marks and, to protect the integrity of the franchisor's name, reputation, system, and goodwill, must *immediately* cease and desist from any further use of the franchisor's system and trademarks.

### *History of the Parties' Business Relationship and Agreements*

16.    On or about May 11, 2009, upon information and belief, Mr. Parvizian formed Bam Bam Sports Houston, LLC, a Texas limited liability company ("Bam Bam"), and was, at all relevant times, the sole owner and member of Bam Bam.

HOWARD & HOWARD ATTORNEYS PLLC

17. On or about August 26, 2011, Bam Bam and SMS entered into a franchise agreement (the "Bam Bam Franchise Agreement 1") under which Bam Bam agreed to own and operate a Sit Means Sit dog training franchise ("Bam Bam Franchise 1") within certain areas in and/or around Houston, Texas, more specifically, within zip codes: 77002, 77003, 77004, 77005, 77006, 77007, 77010, 77019, 77021, 77023, 77024, 77025, 77027, 77030, 77033, 77036, 77042, 77046, 77054, 77056, 77057, 77061, 77063, 77074, 77081, 77087, 77096, 77098, 77201, and 77401 ("Houston Area 1"). A true and accurate copy of Bam Bam Franchise Agreement 1 is attached hereto as Exhibit 2. Contemporaneously with the execution of the Bam Bam Franchise Agreement, Mr. Parvizian also executed a guaranty agreement (the "Bam Bam Guaranty 1") under which Mr. Parvizian personally guaranteed Bam Bam's performance of the duties and obligations set forth in the Bam Bam Franchise Agreement. A true and accurate copy of the Bam Bam Guaranty 1 is attached hereto as Exhibit 3. Mr. Parvizian, on behalf of Bam Bam, also executed a document denominated Collateral Assignment of Telephone Numbers and Telephone Listings, Internet Addresses and Social Media Identities (the "Bam Bam Collateral Assignment 1"). A true and accurate copy of the Bam Bam Collateral Assignment 1 is attached hereto as Exhibit 4. Under the collateral assignment, Bam Bam agreed, among other things, to assign its telephone numbers, telephone directory listings, domain names, and social media accounts to SMS, and further agreed that, upon termination of the franchise agreement, SMS would be able to direct third parties, such as telephone companies, Internet service providers, and social media providers to transfer control over those accounts to SMS. After executing these agreements, Mr. Parvizian and Bam Bam began operating a Sit Means Sit® dog training franchise in Houston Area 1. Mr. Parvizian subsequently registered the name "Sit Means Sit Dog Training Houston" with the Texas Secretary of State as an assumed name for Bam Bam.

18. On or about October 1, 2013, Bam Bam and SMS entered into a franchise agreement ("Bam Bam Franchise Agreement 2") under which Bam Bam agreed to own and operate a Sit Means Sit dog training franchise (the "Bam Bam Franchise 2") within certain areas in and/or around Houston, Texas, more specifically, within zip codes: 77055, 77077, 77084, 77058, 77065, 77084, 77089, 77095, 77449, 77450, 77494, 77433, 77429, 77041, 77065, 77433,

HOWARD & HOWARD ATTORNEYS PLLC

77493, and 77494 ("Houston Area 2"). A true and accurate copy of Bam Bam Franchise Agreement 2 is attached hereto as Exhibit 5. Contemporaneously with the execution of Bam Bam Franchise Agreement 2, Mr. Parvizian also executed a guaranty agreement ("Bam Bam Guaranty 2") under which Mr. Parvizian personally guaranteed Bam Bam's performance of the duties and obligations set forth in Bam Bam Franchise Agreement 2. A true and accurate copy of Bam Bam Guaranty 2 is attached hereto as Exhibit 6. Mr. Parvizian on behalf of Bam Bam, also executed a Collateral Assignment of Telephone Numbers and Telephone Listings, Internet Addresses and Social Media Identities (the "Bam Bam Collateral Assignment 2"). A true and accurate copy of Bam Bam Collateral Assignment 2 is attached hereto as Exhibit 7. Under the collateral assignment, Bam Bam agreed, among other things, to assign its telephone numbers, telephone directory listings, domain names, and social media accounts to SMS, and further agreed that, upon termination of the franchise agreement, SMS would be able to direct third parties, such as telephone companies, Internet service providers, and social media providers to transfer control over those accounts to SMS. In addition, Mr. Parvizian executed an agreement denominated Confidentiality and Non-Competition Agreement ("Parvizian Confidentiality and Non-Competition Agreement 1"). A true and accurate copy of Parvizian Confidentiality and Non-Competition Agreement is attached hereto as Exhibit 8. After executing these agreements, Mr. Parvizian and Bam Bam began operating a Sit Means Sit® dog training franchise in Houston Area 2.

19.     In anticipation of obtaining additional territories from SMS in and/or around Houston, Texas, on or about May 20, 2014, Mr. Parvizian formed Elite K9 Concepts Houston, LLC ("Elite Houston"). Upon information and belief, Mr. Parvizian owned, at all relevant times, 100% of the membership interests in Elite Houston.

20.     In anticipation of obtaining new territories from SMS in and/or around Dallas, Texas, on or about December 10, 2014, Mr. Parvizian formed Elite K9 Concepts Dallas, LLC ("Elite Dallas"). Mr. Parvizian owned, at all relevant times, 70% of the membership interests in Elite Dallas, and the remaining 30% of the membership interest in Elite Dallas were owned by Eli Vega ("Mr. Vega").

HOWARD & HOWARD ATTORNEYS PLLC

21.     On or about January 28, 2015, Elite Dallas and SMS entered into a franchise agreement ("Elite Dallas Franchise Agreement") under which Elite Dallas agreed to own and operate a Sit Means Sit dog training franchise (the "Elite Dallas Franchise") within certain areas in and/or around Dallas, Texas, more specifically, within zip codes: 75201, 75204, 75205, 75206, 75209, 75214, 75219, 75225, 75226, and 75246 ("Dallas Area 1").  A true and accurate copy of the Elite Dallas Franchise Agreement is attached hereto as Exhibit 9.  Contemporaneously with the execution of the Elite Dallas Franchise Agreement, Mr. Parvizian also executed a guaranty agreement (the "Elite Dallas Guaranty") under which Mr. Parvizian personally guaranteed Elite Dallas's performance of the duties and obligations set forth in Elite Dallas Franchise Agreement. A true and accurate copy of Elite Dallas Guaranty is attached hereto as Exhibit 10.  Mr. Parvizian on behalf of Elite Dallas, also executed a Collateral Assignment of Telephone Numbers and Telephone Listings, Internet Addresses and Social Media Identities (the "Elite Dallas Collateral Assignment").  A true and accurate copy of the Elite Dallas Collateral Assignment is attached hereto as Exhibit 11.  Under the collateral assignment, Elite Dallas agreed, among other things, to assign its telephone numbers, telephone directory listings, domain names, and social media accounts to SMS, and further agreed that, upon termination of the franchise agreement, SMS would be able to direct third parties, such as telephone companies, Internet service providers, and social media providers to transfer control over those accounts to SMS.  In addition, Mr. Parvizian executed an agreement denominated Confidentiality and Non-Competition Agreement ("Parvizian Confidentiality and Non-Competition Agreement 2").  A true and accurate copy of Parvizian Confidentiality and Non-Competition Agreement is attached hereto as Exhibit 12.  Mr. Vega also executed an agreement denominated Confidentiality and Non-Competition Agreement ("Vega Confidentiality and Non-Competition Agreement").  A true and accurate copy of the Vega Confidentiality and Non-Competition Agreement is attached hereto as Exhibit 13.  After executing these agreements, Mr. Parvizian, Mr. Vega, and Elite Dallas began operating a Sit Means Sit® dog training franchise in Dallas Area 1.

22.     On or about March 1, 2015, Elite Houston and SMS entered into a franchise agreement ("Elite Houston Franchise Agreement") under which Elite Houston agreed to own and

operate a Sit Means Sit dog training franchise (the "Elite Houston Franchise") within certain areas in and/or around Houston, Texas, more specifically, within zip codes: 77373, 77375, 77380, 77381, 77382, 77384, 77385, 77386, and 77389 ("Houston Area 3"). A true and accurate copy of Elite Houston Franchise Agreement is attached hereto as Exhibit 14. Contemporaneously with the execution of Elite Houston Franchise Agreement, Mr. Parvizian also executed a guaranty agreement (the "Elite Houston Guaranty") under which Mr. Parvizian personally guaranteed Elite Houston's performance of the duties and obligations set forth in the Elite Houston Franchise Agreement. A true and accurate copy of the Elite Houston Guaranty is attached hereto as Exhibit 15. Mr. Parvizian on behalf of Elite Houston, also executed a Collateral Assignment of Telephone Numbers and Telephone Listings, Internet Addresses and Social Media Identities (the "Elite Houston Collateral Assignment"). A true and accurate copy of the Elite Houston Collateral Assignment is attached hereto as Exhibit 16. Under the collateral assignment, Elite Houston agreed, among other things, to assign its telephone numbers, telephone directory listings, domain names, and social media accounts to SMS, and further agreed that, upon termination of the franchise agreement, SMS would be able to direct third parties, such as telephone companies, Internet service providers, and social media providers to transfer control over those accounts to SMS. In addition, Mr. Parvizian executed an agreement denominated Confidentiality and Non-Competition Agreement ("Parvizian Confidentiality and Non-Competition Agreement 3"). A true and accurate copy of Parvizian Confidentiality and Non-Competition Agreement 3 is attached hereto as Exhibit 17. After executing these agreements, Mr. Parvizian and Elite Houston began operating a Sit Means Sit® dog training franchise in Houston Area 3.

23. On or about September 20, 2017, Mr. Parvizian formed SMSHTX, LLC as a Texas limited liability company. Upon information and belief, Mr. Parvizian formed SMSHTX, LLC in anticipation, and for the purpose of, consolidating certain of his Houston-area franchises (*i.e.*, Bam Bam Franchise 1 and the Elite Houston Franchise) under a single corporate entity at some point in the future.

24. On or about April 2, 2019, SMS, Elite Dallas, Mr. Parviizian, Mr. Vega, and College Station Pet Services, LLC ("College Station Pet Services") entered into an transfer

agreement allowing Elite Dallas, Mr. Parvizian, and Mr. Vega to assign their entire interest in the Elite Dallas Franchise to College Station Pet Services (the "Elite Dallas Transfer Agreement"). A true and accurate copy of the Elite Dallas Transfer Agreement is attached hereto as Exhibit 18. After or in connection with their execution of the Elite Dallas Transfer Agreement, Elite Dallas, Mr. Parvizian, and Mr. Vega assigned their entire interest in the Elite Dallas Franchise to College Station Pet Services.

25.     On or about February 2, 2021, Mr. Parvizian, Mr. Arnette, and Mindy Dang ("Ms. Dang") formed Defendant SMS NC, LLC (defined above as "SMS NC").  Upon formation, Mr. Parvizian owned 50% of the membership interests of SMS NC, Mr. Arnette owned 30% of the membership interests of SMS NC, and Ms. Dang owned 20% of the membership interests of SMS NC.  Upon information and belief, Mr. Parvizian, Mr. Arnette, and Ms. Dang formed SMS NC in anticipation, and for the purpose of, operating a new Sit Means Sit® dog training franchise in and/or around Winston-Salem, North Carolina.

26.     On or about March 9, 2021, SMS NC and SMS entered into a franchise agreement (the "Winston-Salem Franchise Agreement") under which SMS NC agreed to own and operate a Sit Means Sit dog training franchise (the "Winston-Salem Franchise") within certain areas in and/or around Winston-Salem, North Carolina, more specifically, within zip codes: 27006, 27012, 27018, 27023, 27040, 27050, 27103, 27104, and 27106 ("Winston-Salem Area 1").  A true and accurate copy of the Winston-Salem Franchise Agreement is attached hereto as Exhibit 19. Contemporaneously with the execution of the Winston-Salem Franchise Agreement, Mr. Parvizian, Mr. Arnette, and Ms. Dang also executed a guaranty agreement (the "Winston-Salem Guaranty") under which Mr. Parvizian, Mr. Arnette, and Ms. Dang personally guaranteed SMS NC's performance of the duties and obligations set forth in Winston Salem Franchise Agreement. A true and accurate copy of Winston Salem Guaranty is attached hereto as Exhibit 20.  Mr. Parvizian, on behalf of SMS NC, also executed a Collateral Assignment of Telephone Numbers and Telephone Listings, Internet Addresses and Social Media Identities (the "Winston-Salem Collateral Assignment").  A true and accurate copy of the Winston-Salem Collateral Assignment is attached hereto as Exhibit 21.  Under the collateral assignment, SMS NC agreed, among other

HOWARD & HOWARD ATTORNEYS PLLC

10

things, to assign its telephone numbers, telephone directory listings, domain names, and social media accounts to SMS, and further agreed that, upon termination of the franchise agreement, SMS would be able to direct third parties, such as telephone companies, Internet service providers, and social media providers to transfer control over those accounts to SMS.  In addition, Mr. Parvizian executed an agreement denominated Confidentiality and Non-Competition Agreement ("Parvizian Confidentiality and Non-Competition Agreement 4").  A true and accurate copy of Parvizian Confidentiality and Non-Competition Agreement 4 is attached hereto as Exhibit 22. Mr. Arnette also executed a Confidentiality and Non-Competition Agreement (the "Arnette Confidentiality and Non-Competition Agreement").  A true and accurate copy of the Arnette Confidentiality and Non-Competition Agreement is attached hereto as Exhibit 23.  Ms. Dang also executed a Confidentiality and Non-Competition Agreement (the "Dang Confidentiality and Non-Competition Agreement").  A true and accurate copy of the Dang Confidentiality and Non-Competition Agreement is attached hereto as Exhibit 24.  After executing these agreements, Mr. Parvizian, Mr. Arnette, Ms. Dang, and SMS NC began operating a Sit Means Sit® dog training franchise in Winston-Salem Area 1.

27.    On or about October 25, 2021, SMS, SMS NC, Mr. Parvizian, Mr. Arnette, and Ms. Dang entered into a Transfer Consent Agreement, pursuant to which agreement, SMS consented to Dang assigning her entire 20% interest in SMS NC to Mr. Parvizian.  A true and accurate copy of the Transfer Consent Agreement is attached hereto as Exhibit 25. Notwithstanding the anticipated transfer of her 20% interest in SMS NC to Mr. Parvizian, Ms. Dang agreed she would remain bound by those portions of the Winston-Salem Franchise Agreement or the Dang Confidentiality and Non-Competition Agreement that survived the transfer of her 20% interest in SMS NC.  (*Id*. ¶ 6.)

28.    Upon information and belief, Ms. Dang subsequently assigned her 20% ownership interest in SMS NC to Mr. Parvizian.

29.    In or before December 2021, Mr. Parvizian asked SMS to consent to the assignment of his entire interest in Bam Bam Franchise 1 and the Elite Houston Franchise to his wholly owned limited liability company, Defendant SMSHTX, LLC (defined above as

HOWARD & HOWARD ATTORNEYS PLLC

"SMSHTX").  SMS agreed to the transfer subject to several conditions.

30.    On or about December 13, 2021, SMS, Mr. Parvizian, Bam Bam, Elite Houston, and SMSHTX entered into a Transfer Consent Agreement, under which Mr. Parvizian, Bam Bam and Elite Houston, with SMS's consent, assigned their entire interest in Bam Bam Franchise 1 and the Elite Houston Franchise to SMSHTX.  A true and accurate copy of the Transfer Consent Agreement is attached hereto as Exhibit 26.  Among other things, the Transfer Consent Agreement required: (1) that Mr. Parvizian, SMSHTX, Bam Bam, and Elite Houston (defined as "Franchisees") comply with the transfer requirements of Article 14 of Bam Bam Franchise Agreement 1 and the Elite Houston Franchise Agreement (defined as the "Franchise Agreements"); (2) that Franchisees pay SMS a reduced transfer fee of $2,000; (3) that Mr. Parvizian personally guarantee "that he will punctually pay and perform each and every undertaking, agreement, and covenant of SMSHTX in the Franchise Agreements;" (4) that Mr. Parvizian agree to be personally bound by, and personally liable for the breach of, each and every provision in the Franchise Agreements, including without limitation, monetary obligations; (5) that Mr. Parvizian execute a franchise owner agreement (the "Franchise Owners Agreement"); and (6) that Franchisees provide SMS with a general release for any and all liabilities, claims, demands, debts, damages, obligations and causes of action of any nature or kind, whether then known or unknown, they may have, or may have ever at any time had, against SMS as of the date the Transfer Consent Agreement was executed (*i.e.*, as of December 13, 2021).  (*Id.*)

31.    As required by the Transfer Consent Agreement, on December 13, 2021, Bam Bam, Elite Houston, and Mr. Parvizian executed a General Release in favor of SMS.  A true and accurate copy of the General Release is attached hereto as Exhibit 27.

32.    As required by the Transfer Consent Agreement, on or about December 13, 2021, Mr. Parvizian executed the Franchise Owner Agreement.  A true and accurate copy of the Franchise Owner Agreement is attached hereto as Exhibit 28.  In the Franchise Owner Agreement, among other things, Mr. Parvizian agreed: (a) to protect SMS's confidential and proprietary information including the trade secrets and know-how that comprise the SMS System from disclosure to third parties; (b) to refrain from certain acts of unfair competition against SMS while

HOWARD & HOWARD ATTORNEYS PLLC

he was an owner of an SMS franchise; (c) to refrain from competing against SMS in the Restricted Territory[1] for a period of two (2) years after termination of the Franchise Agreement; (d) that these restrictions are reasonable as to duration and geographic territory; and (e) to personally guaranty punctual payment of all payment and other financial obligations.

33.    As required by the Transfer Consent Agreement and Article 14 of the Franchise Agreements, on or about December 13, 2021, SMS and SMSHTX entered into a franchise agreement (the "SMSHTX Franchise Agreement") under which SMSHTX agreed to own and operate a Sit Means Sit dog training franchise (the "SMSHTX Franchise") within Houston Area 1 (with the sole exception of zip code 77087). A true and accurate copy of the SMSHTX Franchise Agreement is attached hereto as Exhibit 29. Contemporaneously with the execution of the SMSHTX Franchise Agreement, Mr. Parvizian also executed a Collateral Assignment of Telephone Numbers and Telephone Listings, Internet Addresses and Social Media Identities (the "SMSHTX Collateral Assignment"). A true and accurate copy of the SMSHTX Collateral Assignment is attached hereto as Exhibit 30. Under the collateral assignment, SMSHTX agreed, among other things, to assign its telephone numbers, telephone directory listings, domain names, and social media accounts to SMS, and further agreed that, upon termination of the franchise agreement, SMS would be able to direct third parties, such as telephone companies, Internet service providers, and social media providers to transfer control over those accounts to SMS. After executing these agreements, Mr. Parvizian and SMSHTX began operating a Sit Means Sit® dog training franchise in Houston Area 1 (with the sole exception of zip code 77087).

34.    As a result of the foregoing transactions, prior to SMS's termination of the SMSHTX Franchise Agreement and the SMS NC Franchise Agreement discussed below, Defendants SMSHTX and Parvizian operated a Sit Means Sit® franchise in Houston Area 1 and Defendants SMS NC, Parvizian, Arnette, and Dang operated a Sit Means Sit® franchise in the Winston-Salem Area.

---

[1] The "Restricted Territory" is defined as: (1) the Trade Area; (ii) any other geographic area wherein Franchisee has operated the Franchised Business (e.g., an Unassigned Area); or (iii) the designated trade area of other 'Sit Means Sit' franchisees . . . ." (Ex. 28, Franchise Owner's Agmt. § 2(c).) "Trade Area" is defined in the Franchise Agreements as "the geographic area specifically identified in **Addendum A**." (Ex. 19, Franchise Agmt. at App'x 1, Definitions; Ex. 29, Franchise Agmt. at App'x 1, Definitions.)

13

1

*Defendants' Breach of the Franchise Agreements*

2

3       35.    Under Paragraph 5.2 of the Franchise Agreements, Defendants were required to

4  make Continuing Royalty payments of $600.00 per Reporting Period (*i.e.*, per month) for each

5  franchise.  If the Continuing Royalty was paid on or before the first day of a Reporting Period that

6  is not a weekend or a holiday, the Continuing Royalty for that period would only be $500.  (*See*

7  Ex. 19, Franchise Agmt. ¶ 5.2; Ex. 29, Franchise Agmt. ¶ 5.2.)

8       36.    Under Paragraph 5.8.1(d) of the Franchise Agreements, Defendants agreed to pay

9  SMS "[a]ll amounts due for any reason, including on account of purchases of goods, supplies, and

10 services relating to the Franchised Business," and further agreed that, "[i]t is a material breach of

11 the Agreements to fail, refuse, or neglect to pay any monies due to SMS when due."  (*See* Ex. 19,

   Franchise Agmt. ¶¶ 5.8.1(d); 15.4.2; Ex. 29, Franchise Agmt., ¶¶ 5.8.1(d); 15.4.2.)

12      37.    However, on literally dozens of occasions, Defendants failed to pay their

13 Continuing Royalty and other payments to SMS in a timely manner, and, as a result, accumulated

14 a substantial past-due balance.[2]  For example, on October 13, 2022, SMS sent Mr. Parvizian an

15 email informing him that the credit card he had on file with SMS was declined when SMS

16 attempted to process Continuing Royalty payment charges.  The email requested that Mr.

17 Parvizian complete and return a credit card authorization form for a different credit card.  Mr.

18 Parvizian responded five days later on October 18, 2022, stating, "Sorry just seeing this message.

19 It's been a hectic day."  SMS responded, indicating that, although a payment for $500 was

20 successfully processed, Defendants still owed $1,000 for the month of October.  A true and

21 accurate copy of the email exchange is attached hereto as Exhibit 31.

22      38.    On or about January 19, 2023, SMS, through counsel, sent a written notice of

23 default to Defendants Elite Houston, SMSHTX, and SMS NC stating, among other things, that,

24 by failing to make timely payments to SMS and by failing to pay all amounts due, Defendants

25 were in default of their obligations under the Franchise Agreements.  A true and accurate copy of

26 the letter is attached hereto as Exhibit 32.  The letter notified Defendants that they had five (5)

27 days from their receipt of the letter to cure their default by paying the past-due balance.  (*Id.* at 2.)

28

HOWARD & HOWARD ATTORNEYS PLLC

---

[2] A transaction report showing literally dozens of late payments is attached hereto as Exhibit 42.

The letter also warned Defendants that under Section 15.3.3 of the Franchise Agreements, SMS had the right to ***immediately*** terminate the Franchise Agreements if the Defendants received three default notices in a 12-month period, even if the defaults were subsequently cured. (*Id.*) The letter further notified Defendants that they were also responsible for paying to SMS all of its "'costs and expenses arising from [the default], including reasonable legal fees and reasonable hourly charges of [SMS's] administrative employees' after cure." (*Id.*) The letter noted that, due to Defendants' default, SMS had incurred legal fees in the amount of $1,200 and properly demanded that Defendants pay that amount within thirty (30) days of Defendants' receipt of this letter. (*Id.*)

39.    On March 10, 2023, SMS sent Mr. Parvizian an email informing him that the credit card(s) he had on file with SMS were declined when SMS attempted to process Continuing Royalty payment charges. SMS informed Mr. Parvizian that it had assessed a $200 late fee because the applicable grace period had passed. Mr. Parvizian responded to the email, stating, "we had an employee have a mini stroke yesteday [sic] so it's been a bit of a scramble. Just catching up. Thank you for the email. I will get this and the late fee handled Monday. I appreciate your understanding as focus on his health and rescheudkeing [sic] a few things." A true and accurate copy of the email exchange is attached hereto as Exhibit 33.

40.    Defendants pattern of failing to timely make Continuing Royalty and other payments continued, as Defendants failed to pay their $600 per month Continuing Royalty payment of each of their three franchises for the month of May 2023.

41.    On May 3, 2023, SMS sent Mr. Parvizian an email informing him that the credit cards he had on file with SMS were declined when SMS attempted to process Continuing Royalty payment charges. A true and accurate copy of the email exchange is attached hereto as Exhibit 34. SMS informed Mr. Parvizian that it would assess a $100 late fee per franchise if the payments were not made by May 6, 2023. Mr. Parvizian did not respond to the email.

42.    In a letter dated May 16, 2023, SMS sent Mr. Parvizian a written notice stating, among other things, that, Defendants had failed to pay the Continuing Royalty for each of their three franchises for the month of May, and that by failing to timely pay their Continuing Royalty

HOWARD & HOWARD ATTORNEYS PLLC

HOWARD & HOWARD ATTORNEYS PLLC

payments, they were in breach of the Franchise Agreements.  A true and accurate copy of the letter is attached hereto as Exhibit 35.  The letter informed Defendants that they had (5) days from receipt of the letter to pay the outstanding balance and warned Defendants that, if they failed to pay the amount owed within the five (5) day period, the Franchise Agreements would ***automatically*** terminate according to their terms.  (*Id*. at 2.)  The letter also informed Defendants that they were in breach of the Franchise Agreements for violating paragraph 7.14 of the Franchise Agreements.  That paragraph required Defendants to "give prompt, courteous and efficient service to the public and operate the Franchised Business . . . to preserve and enhance the value and goodwill of the Marks and the System."  It also required Defendants to "uphold . . . high standards of honesty, integrity, and fair dealing in dealing with the general public, customers of the Franchised Business, other franchisees and [SMS]."  The letter informed Defendants that they had violated paragraph 7.14 by issuing a refund check to a dissatisfied customer that was returned for insufficient funds, reflecting poorly on the SMS brand, and requiring SMS to pay the refund to Defendants' dissatisfied customer itself in the amount of $861.25.  The letter warned Defendants that under Section 15.3.3 of the Franchise Agreements, SMS had the right to immediately terminate the Franchise Agreements if the Defendants received three default notices in a 12-month period, even if the defaults were subsequently cured.  (*Id*. at 2.)  The letter notified Defendants of the cross-default provision, set forth in paragraph 15.6, that makes a default of any one agreement between the parties a breach of every other agreement between the parties, and provides that if SMS decides to terminate any one of the parties' agreements, it may terminate any or all of the parties' agreements.  (*Id*.)  The letter noted that, due to Defendants' default, SMS had incurred legal fees in the amount of $1,200 and properly demanded that Defendants pay that amount within thirty (30) days of Defendants' receipt of this letter.  (*Id*. at 3.)  The letter notified Defendants that, if they failed to cure all noticed defaults, SMS would have the right to terminate the Franchise Agreements and seek any and all of its legal remedies, and that Defendants would be required to comply with all post-termination obligations set forth in the parties' agreements, including the following:

(1) You will no longer be licensed to operate the Licensed Business. You will be

required to immediately cease and refrain, on a continuous basis, from representing yourself as a licensee or former licensee of SMS ([Franchise] Agreements, at §§ 16.1.3, 16.1.4);

(2) You will be required to immediately cease using SMS's System and methods of operation as well as any forms, Manuals, slogans, signs, symbols or devices that You used in connection with the operation of the Licensed Business. You will be required to immediately cease using the Marks and any confusingly similar trademark, service mark, trade name, logotype or other commercial symbol or insignia, as well as any name(s) that was or were associated with the name "Sit Means Sit" and take all necessary action to cancel any assumed name or equivalent registration that contains the Mark "Sit Means Sit" or any other Marks, and take any actions necessary to make cosmetic changes to the Vehicles and Training Facilities operated in connection with the Licensed Business to remove the Marks ([Franchise] Agreements, at § 16.1.1);

(3) You will be required to immediately cease to use all Trade Secrets and all photographs, images, videos, testimonials and Advertisements. You will be required to immediately return the Manuals, all training materials, CD ROMs, DVDs, records, customer lists, files, advertising and promotional materials, and all other written materials incorporating or containing Trade Secrets. All customer lists and customer information possessed by You will be deemed to be property of SMS and are automatically assigned to SMS ([Franchise] Agreements, at § 16.1.1);

(4) You will be prohibited for a two-year period from operating any Competitive Activities at any location within: (i) the Trade Area; (ii) any other geographic areas where you have operated the Licensed Business; or (iii) the designated trade area of other SMS franchisees ([Franchise] Agreements, at § 13.1.2(a));

(5) You will be prohibited for a two-year period from soliciting business of any kind or nature from any person who was a customer of yours during the 24-month period immediately preceding your termination ([Franchise] Agreements, at § 13.1.2(b));

(6) You will be required to immediately pay any and all amounts owing to SMS and its Affiliates ([Franchise] Agreements, at § 16.1.2);

(7) You will be required to assign to SMS all telephone numbers (and associated listings) for the Licensed Business, and must notify the telephone company and all listing agencies of the termination or expiration of your right to use any telephone number and any classified or other telephone directory listings associated with the Licensed Business, and authorized and instruct their transfer to SMS ([Franchise] Agreements, at § 16.1.5);

(8) You will be required to cancel or assign to SMS or its designate all of your right, title and interest in any Internet websites or web pages, e-mail addresses, social media identities, domain name listings and registrations which contain the Marks, or any of them, in whole or in part, and you must notify Verisign (Network Solutions), register.com, or other applicable domain name registrar and all listing

agencies, upon the termination or expiration hereof, of the termination of its right to use any domain name, web page and other Internet device associated with SMS or the Licensed Business, and authorize and instruct their cancellation or transfer to SMS ([Franchise] Agreements, at§ 16.1.7);

(9) You will be required to deliver all goods and materials containing the Marks to SMS, and SMS shall have the sole and exclusive use of any items containing the Marks ([Franchise] Agreements, at § 16.1.6); and

(10) Under Section 13.2 of the Agreements, you, and anyone associated with the Licensed Business will be required to maintain the absolute confidentiality and secrecy of all Trade Secrets that have been given or made known to you by SMS ([Franchise] Agreements, at § 13.2).

(*See* Ex. 35; *see also* Ex. 19, Franchise Agmt., Article 16; Ex. 29, Franchise Agmt., Article 16.)

43.    The letter concluded by informing Defendants that, they had five (5) days to cure their defaults by: (1) paying SMS the overdue Continuing Royalty payments totaling $1,800; (2) reimbursing SMS for the payment it made to Defendants' customer in the amount of $861.25; and (3) paying SMS for its legal fees and administrative expenses in the amount of $1,200 within thirty (30) days. (*Id.* at 4.) The letter concluded by notifying Defendants that their failure to comply would result in the Franchise Agreements being automatically terminated. (*Id.*)

### *Termination of the Franchise Agreements*

44.    Defendants, however, failed to make any of the payments demanded by SMS in its May 16, 2023, letter. Additionally, not only did Defendants fail to cure their defaults, but they also failed to pay their $600 per month Continuing Royalty payment for each of their three franchises for the month of June 2023.

45.    On June 1, 2023, SMS sent Mr. Parvizian an email informing him that the credit cards he had on file with SMS were declined when SMS attempted to process the Continuing Royalty payment transactions. SMS informed Mr. Parvizian that it would assess a $100 late fee per franchise if the payments were not made by June 6, 2023. Mr. Parvizian responded to the email, claiming that he had been out of the office due to a foot injury. A true and accurate copy of the email exchange is attached hereto as Exhibit 36. Notwithstanding the email from SMS, no payments were made. True and accurate copies of open balance reports for SMSHTX and SMS NC are attached hereto as Exhibit 43.

HOWARD & HOWARD ATTORNEYS PLLC

HOWARD & HOWARD ATTORNEYS PLLC

46.     As a result, in a letter dated June 9, 2023, SMS notified Defendants that, as a result of their failure to cure their prior defaults, as a result of their failure to pay their June 2023, Continuing Royalty payments, as a result of their repeated defaults, and in accordance with the Franchise Agreements' cross-default provisions, all of the parties' agreements were terminated, effective immediately.  A true and accurate copy of the letter is attached hereto as Exhibit 37.  The letter informed Defendants a second time of their post-termination obligations under the parties' Franchise Agreements.

47.     The letter concluded by informing Defendants that they could avoid having SMS pursue its legal remedies against them if they complied with each of their post-termination obligations and returned a completed copy of an enclosed Closing Checklist on or before June 22, 2023.  (*Id*. at 4.)

48.     Defendants, however, failed to respond to SMS's June 9, 2023 notice of termination and failed to return the closing checklist.

49.     Mr. Parvizian contacted SMS and requested copies of the parties' written agreements.  On or about June 27, 2023, SMS's counsel sent Mr. Parvizian a letter enclosing copies of the agreements Mr. Parvizian requested.  A true and accurate copy of the letter (minus enclosures) is attached hereto as Exhibit 38.  The letter noted SMS's new address and again requested that Mr. Parvizian return the completed Closing Checklist.  (*Id*. at 2.)

***Defendants' Unlwful Conduct in Violation of the Parties' Agreements***

50.     On or about June 28, 2023, Mr. Parvizian formed K9-11 Consulting, LLC ("K9-11 Consulting") as a Texas limited liability company.  Upon information and belief, Mr. Parvizian formed K9-11 Consulting in violation of the non-competition provisions set forth in the parties' agreements and for the prohibited purpose of continuing to operate a dog training business using SMS's confidential information, trade secret System, and Marks in the Restricted Territory.

51.     On Tuesday, July 11, 2023, Jessica Hayward ("Ms. Hayward"), one of Defendants' customers emailed SMS to inform it that Defendants had forced Ms. Hayward's dog "Goose" to remain in a kennel without food and in his own feces and urine for eleven (11) long days.  A true and accurate copy of the email is attached hereto as Exhibit 39.  Ms. Hayward informed SMS that

HOWARD & HOWARD ATTORNEYS PLLC

she had taken Goose to the veterinarian who prescribed Goose medication to rid him of worms. (*Id*.) Ms. Hayward informed SMS that she asked Mr. Parvizian to reimburse her for the cost of veterinarian bills but that he did not honor her request. (*Id*.) Ms. Hayward also informed SMS of another dog owner who boarded her dog at Defendants' kennel, and claimed that her dog was also starved, dehydrated, and infected by hook works from sitting in its own feces and urine, noting that the dog was undergoing emergency veterinary care. (*Id*.)

52.     After receiving Ms. Hayward's report, on July 12, 2023, SMS's President Alfredo Rivera visited the Mr. Parvizian's location in Houston, Texas. Mr. Rivera found that, despite SMS having terminated the parties' agreements, Defendants were continuing to operate a dog training business using the SMS System and Marks in violation of the Franchise Agreements' post-termination obligations, and that Defendants had taken absolutely no steps whatsoever to comply with the franchise agreements' post-termination obligations or to otherwise disassociate themselves from SMS.

53.     On July 12, 2023, SMS's undersigned counsel wrote Mr. Parvizian and demanded, among other things, that Defendants comply with the Franchise Agreements' post-termination obligations and that Defendants cease and desist from any continued use of the SMS System and Marks. A true and accurate copy of the letter is attached hereto as Exhibit 40. SMS's counsel noted that, although Defendants had already had over three weeks to comply with the Franchise Agreements' post-termination obligations, SMS would give Defendants a one-time, thirty (30) day, extension of time to comply, noting that, to avoid legal action, Defendants would need to fully comply with the franchise agreements' post-termination obligations by **August 12, 2023**.

54.     In a letter dated July 17, 2023, Mr. Parvizian's counsel wrote SMS's counsel demanding, among other things that, despite the clear and unambiguous language of the Franchise Agreements, that SMS cease and desist from threatening to terminate or terminating (the already terminated) Franchise Agreements. A true and accurate copy of the letter is attached hereto as Exhibit 41. Notably, the letter does not state that Mr. Parvizian will comply with the Franchise Agreements' post-termination obligations or that he will cease and desist from using the SMS Marks or System despite SMS having given Defendants an additional thirty (30) days to do so.

(*Id*.)  Instead, the letter threatens SMS with a lawsuit asserting several conclusory claims, but fails to recite any factual or legal basis for asserting any claim against SMS.  (*Id*.)  The letter appears to be a complete rejection of SMS's request that Defendants comply with the post-termination obligations set forth in the Franchise Agreements and also appears to be a complete rejection of SMS's demand that Defendants cease and desist from any further unauthorized use of the SMS Marks and System.

55.    To date, Defendants have failed and refused to comply with the franchise agreements' post-termination obligations, have failed and refused to cease and desist from operating a dog training business in the Restricted Territories, and are now operating unauthorized dog training businesses in violation of their covenants not to compete in the Restricted Territories, including in the Houston, Texas, and Winston-Salem, North Carolina, metropolitan areas, using SMS's confidential information, trade secrets, System, and Marks to do so.

### *SMS is Suffering Irreparable Harm*

56.    Prior to the termination of their Houston and Winston-Salem franchises, while they were still licensed to do so, Defendants used the SMS Marks and System to advertise, promote, and operate their Sit Means Sit® franchises.  However, when SMS terminated the franchise and other agreements on June 9, 2023, Defendants' limited license to use the SMS Marks and System was also terminated.  As a result, Defendants are no longer licensed to engage in any use of the SMS Marks and System whatsoever.  Nevertheless, Defendants are currently engaged in the unauthorized use of the SMS Marks on the Instagram pages @sitmeanssithouston and @sitmeanssitwinstonsalem.  Defendants are currently engaged in the unauthorized use of the SMS Marks on the Facebook pages of their former Houston and Winston-Salem Sit Means Sit® franchises.  Defendants are currently engaged in the unauthorized use of the SMS Marks in connection with the addresses of their former Houston and Winston-Salem-based Sit Means Sit® franchises on Yelp and MapQuest.  Defendants are currently engaged in the unauthorized use of the SMS Marks to advertise and promote their unauthorized dog training business on Twitter (now known as "X") and LinkedIn.  Notwithstanding SMS's termination of Defendants' Franchise Agreements and the limited licenses contained therein, Defendants are continuing to associate

HOWARD & HOWARD ATTORNEYS PLLC

themselves with SMS, are continuing to use the SMS Marks in commerce, and are continuing to use and misuse the SMS System, but are no longer licensed or authorized to do so.  Because Defendants have failed and refused to cease and desist from their unauthorized use of the SMS Marks and System, SMS has lost control over how its SMS Marks are used in commerce as well as the protection of its System from the unauthorized use by or disclosure to others.  This is presently causing, and, unless enjoined, will continue to cause, irreparable injury and harm to SMS, including to the goodwill it has acquired in the SMS Marks, and has placed and continues to place the confidential elements of the System in jeopardy of further unauthorized use and unauthorized disclosure to third parties.

57.    As the direct and proximate result of Defendants' continued and unauthorized operation of a Sit Means Sit® dog training business, SMS is suffering irreparable harm and injury to its business, reputation, goodwill, and trade secrets.  Defendants have become rogue, holdover, franchisees, who have no regard for SMS or the protection of its System, goodwill, confidential informnation, or trade secrets.  As a direct and proximate result, SMS has lost all ability to control the quality of services Defendants are providing in connection with the SMS Marks and have lost the ability to control the use and disclosure of the System.  Absent preliminary and permanent injunctive relief, SMS will continue to suffer irreparable harm and injury to its business, reputation, goodwill, and trade secrets.

**COUNT I**
(Breach of Franchise Agreements
– against Defendants SMSHTX and SMS NC)

58.    SMS incorporates the allegations in the preceding paragraphs as if fully set forth herein.

59.    The SMSHTX Franchise Agreement (Ex. 29) and the SMS NC Franchise Agreement (Ex. 19) are valid and existing contracts.

60.    Defendants SMSHTX and SMS NC substantially and materially breached the SMSHTX Franchise Agreement and the SMS NC Franchise Agreement by, among other things: (a) failing to pay royalty and other fees to SMS when they were due; (b) continuing to use the System after the SMSHTX Franchise Agreement and the SMS NC Franchise Agreement were

HOWARD & HOWARD ATTORNEYS PLLC

1    terminated; (c) continuing to use the SMS Marks in commerce after the SMSHTX Franchise

2    Agreement and the SMS NC Franchise Agreement were terminated; (d) continuing to operate a

3    dog training business in violation of the non-competition provisions set forth in the SMSHTX

4    Franchise Agreement and in the SMS NC Franchise Agreement; and (e) failing to comply with

5    the post-termination provisions set forth in the SMSHTX Franchise Agreement and in the SMS

6    NC Franchise Agreement.

7         61.     As a direct and proximate result of Defendants' breach of the SMSHTX Franchise

8    Agreement and the SMS NC Franchise Agreement, SMS has suffered and will continue to suffer,

9    irreparable injury to its business, reputation, and goodwill as well as financial and pecuniary injury

10    in an amount to be determined at trial.

### COUNT II
(Breach of the Winston-Salem Guaranty, the Parvizian Confidentiality and
Non-Competition Agreement 4, and the Franchise Owner Agreement
– against Mr. Parvizian)

14         62.     SMS incorporates the allegations in the preceding paragraphs as if fully set forth

15    herein.

16         63.     As set forth above, in connection with his ownership and operation of a Sit Means

17    Sit® franchise in Winston-Salem North Carolina, Mr. Parvizian executed the Winston-Salem

18    Guaranty (Ex. 20) and the Parvizian Confidentiality and Non-Competition Agreement 4 (Ex. 22),

19    and in connection with his ownership and operation of a Sit Means Sit® franchise in Houston,

20    Texas, Mr. Parvizian executed the Franchise Owner Agreement (Ex. 28), all of which are valid

21    and existing contracts.

22         64.     Mr. Parvizian has substantially and materially breached the Winston-Salem

23    Guaranty, the Parvizian Confidentiality and Non-Competition Agreement 4, and the Franchise

24    Owners Agreement by, among other things: (a) failing to make all required royalty payments to

25    SMS as required by the parties' franchise agreements; (b) failing to comply with the post-

26    termination obligations set forth in the parties' franchise agreements; (c) disclosing SMS's

27    confidential, proprietary, and trade secret information comprising the SMS System to K9-11

28    Consulting so that it may operate a competitive dog training business; (d) using SMS's

HOWARD & HOWARD ATTORNEYS PLLC

confidential, proprietary, and trade secret information comprising the SMS System in connection with a competitive dog training business operated by K9-11 Consulting; and (e) owning and operating a competitive dog training business after termination of the SMSHTX Franchise Agreement and the SMS NC Franchise Agreement..

65.    As a direct and proximate result of Mr. Parvizian's substantial and material breaches of the Winston-Salem Guaranty (Ex. 20), the Parvizian Confidentiality and Non-Competition Agreement 4 (Ex. 22), and the Franchise Owner Agreement (Ex. 28), SMS has suffered and will continue to suffer, irreparable injury to its business, reputation, and goodwill as well as financial and pecuniary injury in an amount to be determined at trial.

<u>**COUNT III**</u>
(Breach of the Winston-Salem Guaranty and the Arnette Confidentiality and
Non-Competition Agreement – against Mr. Arnette)

66.    SMS incorporates the allegations in the preceding paragraphs as if fully set forth herein.

67.    As set forth above, in connection with his ownership and operation of a Sit Means Sit® franchise in Winston-Salem North Carolina, Mr. Arnette executed the Winston-Salem Guaranty (Ex. 20) and the Arnette Confidentiality and Non-Competition Agreement 4 (Ex. 23), all of which are valid and existing contracts.

68.    Mr. Arnette has substantially and materially breached the Winston-Salem Guaranty and the Arnette Confidentiality and Non-Competition Agreement by, among other things: (a) failing to make all required royalty payments to SMS as required by the parties' franchise agreements; (b) failing to comply with the post-termination obligations set forth in the parties' franchise agreements; (c) using SMS's confidential, proprietary, and trade secret information comprising the SMS System in connection with a competitive dog training business; and (d) owning and operating a competitive dog training business after termination of the SMS NC Franchise Agreement.

69.    As a direct and proximate result of Mr. Arnette's substantial and material breaches of the Winston Salem Guaranty (Ex. 20) and the Arnette Confidentiality and Non-Competition Agreement (Ex. 23), SMS has suffered and will continue to suffer, irreparable injury to its

business, reputation, and goodwill as well as financial and pecuniary injury in an amount to be determined at trial.

**COUNT IV**
(Trademark Counterfeiting/Infringement – 15 U.S.C. 1114
– against all Defendants)

70.    SMS incorporates the allegations in the preceding paragraphs as if fully set forth herein.

71.    SMS is the exclusive licensee of all right title, and interest in and to the SMS Marks.

72.    On June 9, 2023, SMS terminated the Franchise Agreements including the limited license under which Defendants were authorized to operate a dog training business using the SMS Marks.  As a result, as of June 9, 2023, Defendants were no longer authorized to use the SMS Marks in commerce in connection with the operation of any business.

73.    Notwithstanding SMS's termination of the Franchise Agreements and the limited licenses contained therein, Defendants have continued to use the SMS Marks in commerce in connection with the operation of dog training businesses in the Houston, Texas, and in Winston-Salem, North Carolina.

74.    Defendants continued use of the SMS Marks after termination of the Franchise Agreements and the limited licenses contained therein has at all times been willful with knowledge of the counterfeit and unauthorized nature of their use.

75.    SMS has not otherwise consented to Defendants' continuing use of the SMS Marks after termination of the Franchise Agreements and the limited licenses contained therein.

76.    Defendants continued use of the SMS Marks after termination of the Franchise Agreements and the limited licenses contained therein is likely to confuse and deceive consumers and constitutes trademark counterfeiting and/or trademark infringement in violation of the Lanham Act, 15 U.S.C. § 1051, *et seq*.

77.    This is an exceptional case within the meaning of 15 U.S.C. § 1117(a).

78.    As a direct and proximate result of Defendants' unauthorized use of the SMS Marks, SMS has suffered and will continue to suffer, irreparable injury to its business, reputation,

HOWARD & HOWARD ATTORNEYS PLLC

and goodwill as well as financial and pecuniary injury in an amount to be determined at trial.

## COUNT V
(Misappropriation of Trade Secrets –18 U.S.C. § 1836 *et seq.*
– against all Defendants)

79.    SMS incorporates the allegations in the preceding paragraphs as if fully set forth herein.

80.    The Defend Trade Secrets Act of 2016 (the "DTSA") became effective on May 11, 2016.  The DTSA created a private cause of action for the owner of a trade secret related to a product or service used in, or intended for use in, interstate or foreign commerce.  SMS's services are used in interstate commerce.

81.    Under the DTSA, a "trade secret" is defined as:

[A]ll forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if--

(A)    the owner thereof has taken reasonable measures to keep such information secret; and

(B)    the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information . . . .

18 U.S.C. § 1839(3).

82.    Under the DTSA, "misappropriation" is defined as:

(A)    **acquisition** of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; **or**

(B)    **disclosure or use** of a **trade secret** of another **without** express or implied **consent** by a person who--

(i)    used improper means to acquire knowledge of the trade secret;

(ii)    **at the time of** disclosure or **use**, knew or had reason to know that the knowledge of the trade secret was—

(I)    derived from or through a person who had used improper means to acquire the trade secret;

HOWARD & HOWARD ATTORNEYS PLLC

HOWARD & HOWARD ATTORNEYS PLLC

(II)    **acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret**; or

(III)   **derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret**; or

(iii)    before a material change of the position of the person, knew or had reason to know that--

(I)    the trade secret was a trade secret; and

(II)    knowledge of the trade secret had been acquired by accident or mistake;

18 U.S.C. § 1839(5) (emphasis added).

83.    When Defendants became Sit Means Sit® franchisees, SMS provided Defendants with the confidential information and trade secrets comprising the System.  This information included, without limitation: (i) proprietary information, training, and know-how concerning how to successfully perform certain dog training activities; (ii) proprietary information, training, and know-how concerning how to successfully modify certain dog behaviors; (iii) proprietary information, training, and know-how concerning how to successfully establish, market, and operate a Sit Means Sit® dog training business, including proprietary marketing and training materials; (iv) proprietary information, training, and know-how concerning specific equipment and devices used in dog training; (v) proprietary supplier lists; and (vi) other proprietary, confidential, and trade secret information concerning the operation of a Sit Means Sit® dog training business.

84.    SMS has taken reasonable measures to keep this information secret.  SMS entered into contracts with Defendants that required, among other things, Defendants to keep SMS's confidential information and trade secrets strictly confidential.  As a result, Defendants owed SMS a duty to keep SMS's confidential information and trade secrets strictly confidential and to not misappropriate, use, or disclose such confidential information and trade secrets.

85.    The information SMS shared with Defendants derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable

HOWARD & HOWARD ATTORNEYS PLLC

through proper means by, another person who can obtain economic value from the disclosure or use of the information. SMS spent substantial time, effort, and money creating the Sit Means Sit® System, developing effective marketing plans and advertising strategies, effective operating procedures, and effective training materials, among other things. This information derives independent economic value because it is not generally known to the public or readily ascertainable through lawful means. It is the information that constitutes the core of SMS's business; it is the information that franchises pay for when they become Sit Means Sit® franchisees; and it is information that would allow a competitor to replicate SMS's successful business.

86.    Defendants have misappropriated and are continuing to use this information without SMS's consent. Despite being terminated as Sit Means Sit® franchisees, Defendants are continuing to operate unauthorized dog training businesses using SMS's confidential information and trade secrets.

87.    As a direct and proximate result of Defendants' unauthorized use of SMS's trade secrets, SMS has suffered and will continue to suffer, irreparable injury to its business, reputation, and goodwill as well as financial and pecuniary injury in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, SMS respectfully prays that this honorable Court grant SMS the following relief:

A.    Entry of a preliminary and permanent injunction enjoining Defendants and their officers, agents, servants, employees, and/or all other persons acting in concert or participation with them, from:

(1)    Operating a Sit Means Sit® or any other competitive dog training business for a period of two years within the Restricted Territories in and/or around: (a) Houston, Texas; and (b) Winston-Salem, North Carolina;

(2)    Using the SMS Marks or any substantially identical or confusingly similar marks in commerce in connection with the operation of a dog training business;

(3)    Misappropriating, using, or disclosing SMS's confidential information,

1    and trade secrets, including, without limitation, the System;

2          (4)    Deleting or destroying evidence (in any form) relevant to SMS's

3    allegations, including, without limitation, text messages, emails, faxes, and letters;

4          B.    Entry of a preliminary and permanent injunction requiring Defendants to

5    specifically perform all post-termination obligations set forth in the Franchise Agreements;

6          C.    Entry of an order awarding SMS compensatory, liquidated, consequential,

7    statutory, and/or punitive damages in an amount to be determined at trial;

8          D.    Entry of an order awarding SMS interest, costs, and attorneys' fees incurred

9    prosecuting this action; and

10         E.    All other relief to which SMS is entitled under the parties' agreements, at law, or

11   in equity.

12         Dated: this 7th day of September 2023

13                                   Respectfully submitted,

14                                   HOWARD & HOWARD ATTORNEYS PLLC

15                                   By:  /s/ Jonathan W. Fountain
                                     Jonathan W. Fountain, Esq.
16                                   Matthew J. Kreutzer, Esq.
                                     3800 Howard Hughes Pkwy., Suite 1000
17                                   Las Vegas, NV 89169
                                     Tel. (702) 257-1483
18                                   Email: jwf@h2law.com
                                     Email: mjk@h2law.com
19

20                                   *Attorneys for Sit Means Sit Franchising, Inc.*

21

22

23

24

25

26

27

28

# VERIFICATION

In accordance with NRS § 15.010, and under penalties of perjury, I, Alfredo Rivera, hereby declare that I am the President of Sit Means Sit Franchising, Inc., the named Plaintiff in the foregoing Complaint; that I know the contents thereof; that the allegations set forth therein are true based upon my own personal knowledge, except as to those matters alleged upon information and belief, which I believe to be true.

Dated: this 7th day of September 2023.

ALFREDO RIVERA
President
Sit Means Sit Franchising, Inc.

4862-8763-5830, v. 1

30